**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **ELIZABETH STONE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:22-cv-1335** |
| ) | |
| **WILLIAM J. BURNS, DIRECTOR,** ) | |
| **CENTRAL INTELLIGENCE AGENCY,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

**COMES NOW** the Plaintiff, ELIZABETH STONE, by Counsel, and files her Complaint against Defendant, Central Intelligence Agency, and in support of such states as follows:

### I.      NATURE OF THE ACTION

1.      This is an action for relief from employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000*e et seq.*

2.      Plaintiff alleges that Defendant unlawfully discriminated against her on the basis of her sex, disability, and retaliated against her for engaging in protected activity and for opposing sexual harassment.

3.      Plaintiff seeks injunctive and declaratory relief, compensatory damages, punitive damages, and reasonable attorneys' fees and costs as remedies for Defendant's violations of her rights.

### II.      PARTIES

4.      Plaintiff ELIZABETH STONE is an individual residing in the Commonwealth of Virginia.

5.      Plaintiff was employed with the Defendant starting in February 2005 until October 26, 2017 when she was terminated.

6.      Plaintiff is an "Employee" within the meaning of 42 U.S.C. § 2000*e*(f).

7.      Defendant, CENTRAL INTELLIGENCE AGENCY ("Agency"), is located in Langley, in the County of Fairfax, in the Commonwealth of Virginia, the office location where Plaintiff worked and was physically present, and all of the events which give rise to this lawsuit occurred while the Plaintiff was employed by Defendant at this location.

8.      At all times relevant herein, Defendant had at least fifty (50) employees.

9.      Defendant is an "employer" within the meaning of 42 U.S.C. § 2000*e*(b).

10.     Defendant is liable for the acts of its employees and agents.

11.     Neither party is an active duty member of the Armed Forces of the United States.

### III.      JURISDICTION AND VENUE

12.     The Court has jurisdiction over this action pursuant to 29 U.S. Code § 1614.407

13.     Venue is proper pursuant to 28 U.S. Code § 1391, since the Defendant offices are located in this District and the events or omissions giving rise to the claim occurred in this District.

### IV.      EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     Plaintiff timely filed a formal complaint with the Agency Office of Equal Employment Opportunity ("OEEO") (Agency No. 18-27) regarding the defendant's alleged discriminatory conduct on March 28, 2018.

15.     The Agency issued a Final Agency Decision ("FAD") on August 24, 2022.

16.     Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## V.     FACTUAL ALLEGATIONS

17.     Plaintiff incorporates by reference paragraphs 1-15.

18.     From October 11, 2015 until her termination on October 26, 2017, Plaintiff was a Finance Resource Officer, GS-13.

19.     From October 11, 2015 to January 4, 2016, Plaintiff was assigned to Finance Policy as a Finance Quality Assurance Reviewer.

20.     From January 5, 2016 to August 29, 2017, Plaintiff was assigned to the Logistics Business Office (DS/OGS/LS) as a Certifier/Cost Accountant.

21.     From August 30, 2017 to October 26, 2017, Plaintiff was assigned to the Asset Management office as a Finance Officer.

22.     During the complaint period, Rickey J ("Ricky J")[1] was the Chief, Office of Global Financial Management/Strategic Talent & Resource Management ("C/OGFM/STRM") and the same level as Joseph M, Chief, Career Development Office.

23.     Mary A was the Acting Director, Office of Global Financial Management Directorate of Support and requested the convening of a Personnel Evaluation Board ("PEB").

24.     During the complaint period, Joseph M was the Chief, Career Development Office.

25.     Plaintiff met Joseph M in connection with her employment with the Agency and in approximately 2005 and their friendship included contact via the Agency instant message system and email, contact outside of work via social media, and social gatherings.

26.     In approximately 2012 or 2013, Joseph M's communications with the Plaintiff began becoming more personal and increasingly in appropriate, with Joseph M describing female coworkers by their attractiveness or their physical proportions, disclosing which coworker he

---

[1] The Agency only identifies individual by their first name and initial of their last name.

thought had homosexual children, and discussing which agency couples he believed had engaged in spouse-swapping.

27.    In approximately August 2013, Joseph M sent a personal phone text message stating that he "may have to stalk" one of the Plaintiff's married female friends he had met.

28.    In approximately June 2015, Joseph M sent messages to Plaintiff stating that he believed his spouse was involved in an extra-marital affair and shared specifics; and subsequently made similar disclosures during an after-work social gathering shortly thereafter.  At the social gathering in question, Joseph M outstretched his arms in an attempt to inappropriately embrace the Plaintiff, who rebuffed him.

29.    At the social gathering in question, Joseph M pointed out to the Plaintiff women he observed at the bar whom he believed were his "type."

30.    During the complaint period, Mary A ("Mary A") was the Deputy Director, OGFM, and then became Acting Director, OGFM upon the Director's departure.

31.    During the complaint period, Greg D ("Greg D") was the Director, OGFM, and Mary A. was Acting Director, OGFM.

32.    During the complaint period, Duane G ("Duane G") was the Financial Controller for the DS/Office of Finance/Working Capital Fund/OL and Office of Enterprise Services, GS-15, and was the Plaintiff's first-line supervisor from approximately October 1, 2016 until August 29, 2017.

33.    During the complaint period, Jason A ("Jason A") was the Chief of Directorate of Support/Office of Logistics/Resources and Tools/Business Office, and was the Plaintiff's second-line supervisor after January 5, 2016 to August 29, 2017.

34.     Between on or about September 2013 and November 2013, Rickey J looked down Platintiff's shirt and stated, "stick with me and I'll take care of you."

35.     Within the Agency it was an accepted practice for an employee to apply for and interview for a position outside an employee's Career Service prior to being granted approval by the employee's current Career Service to apply to the different Career Service.

36.     Different positions within the Agency have different tour lengths. When an employee seeks to transfer to a new position prior to completing the required tour length, that action is called, "short of tour."  Standard GS-13 positions had tour lengths of a minimum of two (2) years but not more than three (3) years.

37.     By approximately October 2015, Joseph M had begun making frequent visits in person to the Plaintiff's desk at work, which visits by a senior officer of the agency stood out as unusual and a coworker of Plaintiff's noted the frequent visits, asking why Joseph M was there so often, and on at least one visit Joseph M asked to accompany her to take the burn bags to the disposal room (which was isolated and otherwise unoccupied), which request Plaintiff declined.

38.     In November 2015, shortly after the Complainant declined Joseph M's offer to accompany her to the burn bag disposal room, Joseph M told Plaintiff during a meeting, "Just go!  If you want to go, just go!"  Following this, Plaintiff blocked Joseph M on all social media accounts.

39.     By December of 2015, Plaintiff was fearful of being alone with Joseph M and would request the presence of a 3rd party for any meeting with Joseph M.

40.     In or around early December 2015, Plaintiff applied for an (internal) position outside her Career Service and was selecting an interview date while simultaneously seeking written

concurrence from OGFM to accept the position, if it was offered; yet OFGM did not oppose nor discipline Plaintiff for applying for a position outside her career service prior to OGFM granting her approval to do so. Joseph M deferred to Ricky J on granting concurrence, and then Ricky J held onto the concurrence paperwork without acting on it, which then allowed Joseph M to claim he needed to find me an assignment.

41.     Starting on January 5, 2016, Plaintiff was assigned to a unit run by Joseph M's spouse, who was above Jason A.

42.     On or around December 7, 2015, Mary A interrupted Plaintiff in a meeting to correct her speech (evidencing she perceived Plaintiff to have a speech disability).

43.     On or about March 22, 2016, Plaintiff was diagnosed with anaphylaxis (allergies), and shortly thereafter she applied for and was approved by the Agency for a reasonable accommodation ("RA") which was she was assigned to work at a different work location for three (3) days per week.  Upon information and belief, Plaintiff's first and second-line supervisors were made aware of her medical condition and RA.

44.     On March 31, 2016, Jason A, Plaintiff's second-level supervisor, approved Plaintiff to apply for a short-of-tour field position and Duane G, her first-level supervisor, concurred.

45.     On approximately April 2016, after receiving approval from the Plantiff's first-line, Tony A., and second-line supervisor, Greg. Plaintiff applied short-of-tour for the (internal) position which allowed short-of-tour applicants with supervisor approval, along with other applicants who were also allowed to apply to the position short-of-tour.

46.     On or around April 5, 2016, Ricky J told Complainant over the telephone: "you are not going anywhere, so stop trying," in response to Plaintiff's request to leave her position short-

of-tour and take a field position.  Plaintiff asked Ricky J to send her an email regarding this telephone conversation.

47.     On April 6, 2016, Plaintiff received an email from Ricky J stating that she would only receive concurrence or approval for short-of-tour requests for OCB's 2017 call and that any others would represent a rotation request not available for her until she completed her current assignment.

48.     Upon information and belief, other employees were allowed to apply short-of-tour to these positions, not just the OCB 2017 call.

49.     By May 2016, Plaintiff had been in her position with six (6) months of documented successful performance qualifying her to apply for other positions short-of-tour and for Temporary Duty ("TDY") assignments; however the first-line supervisor Tony A told Plaintiff that she would not be qualified to apply for short-of-tour assignments or TDYs until she successfully completed her performance appraisal cycle, which she did by July 31, 2016  Tony A. left the positon shortly after (June time frame) completing the out of cycle performance review in July after Tony A had left.  Out of cycle reviews are required when a first line supervisor leaves.  It was never clear where the guidance originated from.

50.     Plaintiff was rated as successful for her performance appraisal cycle that ended on July 31, 2016 and at that time Ricky J told her that her eligibility to apply for TDYs could be addressed the following year.

51.     On or about May 17, 2016, Plaintiff contacted the Agency EEO Counselor and complained that Tony A, her supervisor, was discriminating against her, harassing her, and not providing her with her mid-cycle feedback.

52.     The Agency EEO Counselor, upon information and belief, contacted Tony A regarding his failure to provide mid-cycle feedback and Tony A agreed to provide the mid-cycle feedback.

53.     On or about May 19, 2016, Plaintiff notified the Agency EEO Counselor that she declined to file a discrimination complaint since Tony A had agreed to provide mid-cycle feedback.

54.     In approximately June 2016, Plaintiff applied for a 2017 Short of Tour field assignment as part of the 'OCB 2017 call,' in compliance with OGFM guidance and the support of her supervisors.

55.     In approximately August and September of 2016, Plaintiff applied for several positions which involved a career service conversion, which were within the parameters of what was appropriate for Plaintiff to apply and not subject to short-of-tour restrictions.

56.     The positions Plaintiff applied to in approximately August and September of 2016, which would have constituted Career Service Conversions had Plaintiff been granted approval by OGFM to apply, allowed Career Service Conversion candidates to apply.

57.     In approximately September 2016, Plaintiff discussed a direct career conversion with Joseph M, and he supported her request so Plaintiff had conversations with Human Resources Officer from a different Directorate who stated that the Plaintiff would be considered for a career conversion if Plaintiff obtained a position in that Directorate.

58.     On or about October 12, 2016, Plaintiff contacted the agency EEO Counselor regarding the discrimination and harassment she was enduring in the workplace.

59.     Starting on or about October 31, 2016, Duane G documented every mistake and error the Complainant made, no matter how inconsequential or minor, and later noted it as evidence

of failing to meet key job expectations ("KJE") even though he failed to establish KJEs until well into her performance appraisal period for the period.

60.     On or about November 15, 2016, Greg D issued a Letter of Warning ("LOW") to Plaintiff for allegedly applying for submitting unspecified (internal) job applications over a period of ten (10) months without (alleged) proper concurrence from Plaintiff's Career Service ("CS") with OFGM claiming that Plaintiff's actions in submitting job applications was an act of insubordination.

61.     The November 15, 2016, LOW did not identify which job applications Plaintiff submitted that were allegedly outside of the acceptable parameters.

62.     The November 15, 2016, LOW deliberately mischaracterized Plaintiff's career aspirations as wanting to stay within finance when Plaintiff had stated to management that she sought positions outside of finance.

63.     On or about November 17, 2016, Plaintiff began experiencing an allergic reaction, including itchy eyes, running nose, and repeated sneezing while at her workstation.  Plaintiff did not depart her workstation until mid-day when she went to a meeting with Duane G and Jason A.  After the meeting Plaintiff notified Jason A via an internal chat application and via telephone that she had reported to a "flex space" since she had been experiencing an allergic reaction at her workstation; Duane G was not appearing as active on the internal chat application so Plaintiff did not notify him.

64.     During Plaintiff's November 17, 2016 telephone call with Jason A she notified him of the allergic reactions she had been having at her workstation due to the deteriorating environment of the workspace (identifying dust and mold), yet Jason A cut short the conversation without addressing Plaintiff's concern.

65.     Later on November 17, 2016, Plaintiff received an email from Duane G stating that Plaintiff had failed to notify him that she was working from a "flex space;" his email did not acknowledge that there was no requirement for an employee to obtain supervisor approval prior to reporting to a flex space.

66.     On or about November 17, 2016, Duane G reprimanded  Plaintiff for allegedly reporting to a different building from the location she was assigned to work.

67.     On January 27, 2017, Duane G finally established the Key Job Expectations ("KJE") for Plaintiff's performance appraisal period from October 31, 2016 to April 27, 2017, which negatively impacted her opportunity to succeed, and the KJEs appeared to be written for a GS-14 or GS-15 position, not the GS-13 position which Plaintiff was responsible for.  Plaintiff complained about the KGEs but her complaints were ignored and the KGEs remained unchanged.

68.     Shortly prior to January 27, 2017, the Plaintiff had notified her second-line supervisor, Jason A, for the third time, that Duane G was creating a hostile work environment.

69.     By early 2017, approximately February 2017, Duane G (Plaintiff's first-line supervisor), was requiring the Plaintiff to attend meetings at her original (pre-RA) location on one of the three (3) days when she had been authorized by her RA to work at an alternate location to accommodate her allergies; so Complainant reported these incidents to Jason A, her second-line supervisor, stating that Duane G was creating a hostile work environment for Plaintiff.

70.     On or about March 13, 2017, the Agency issued a Letter of Reprimand to the Plaintiff alleging "unprofessional behavior and insubordination," for applying for positions outside of her Career Service.

71.     On or about April 25, 2017, the Agency issued a Letter of Reprimand to the Plaintiff alleging "unprofessional behavior and insubordination," for applying for positions outside of her Career Service.

72.     Plaintiff's performance appraisal which closed on April 26, 2017 rated Plaintiff as lacking "the ability to analyze and interpret financial information," and requiring daily, "technical and/or financial guidance" by Duane G, even though she was in the same position as she had been during the prior performance evaluation period which closed out in July 2016, when Plaintiff was rated as "completely successful."

73.     On or around May 18, 2017, Mary A interrupted Plaintiff in a meeting to correct her speech (evidencing she perceived Plaintiff to have a speech disability), this was a mediation of a complaint of discrimination filed by the Plaintiff with the Agency EEO Counselor.

74.     On June 27, 2017, Plaintiff filed an EEO Complaint with the Agency EEO Counselor, naming Jason A and Duane G as the responsible management officials discriminating against her based on disability, sex, requesting a reasonable accommodation, retaliation, and creating a hostile work environment.

75.     On or about July 7, 2017, Jason A and Duane G asked the Plaintiff about her use of leave and required her to produce a Doctor's note for her absence.

76.     On or about July 7, 2017, Jason A and Duane G disallowed the Plaintiff from the reasonable accommodation she had been approved for which permitted the Plaintiff from working from an alternate location.

77.     On or about July 7, 2017, Jason A and Duane G changed Complainant's work location and work schedule.

78.     On or about July 7, 2017, Jason A and Duane G issued Complainant a Letter of Reprimand for taking "excessive" leave.

79.     In about early- to mid-July 2017, Plaintiff contacted the agency EEO Counselor regarding the discrimination and harassment she was enduring in the workplace.

80.     On or about July 19, 2017, Jason A and Duane G contacted the Office of Inspector General ("OIG") to question the Plaintiff's whereabouts and informed the Plaintiff's Career Service that she was not at the OIG.

81.     On August 23, 2017, Mary A issued a memorandum requesting a PEB be convened to consider the Plaintiff's suitability for continued employment with the agency.  The August 23, 2017 memo contains false and contrived information and innuendo regarding the Plaintiff's job performance and personality designed to support Plaintiff's termination.

82.     The PEB Memo of August 23, 2017 and its attachments also allude to the Plaintiff's requests for a reasonable accommodation and her complaints of discrimination to the agency EEO Counselor and lodging of hostile work environment claims with her management.

83.     At some point subsequent to August 23, 2017 and her termination date of October 26, 2017, Mary A, Greg D, Rickey J, Joseph M, Jason A, and Duane G provided false information to the Personnel Evaluation Board.

84.     The false information provided by agency management to the PEB was based on retaliation and discrimination against the Plaintiff based on her opposing discrimination, opposing sexual harassment, reporting harassment, requesting a reasonable accommodation, and discrimination based on disability (allergies and perceived speech disability).

85.    Upon information and belief, Mary A, Greg D, Rickey J, Joseph M, Jason A, and Duane G were aware of the Plaintiff's prior EEO activity, disability status, sex, discrimination and harassment complaints, and requests for a reasonable accommodation.

86.    As of October 26, 2017, Plaintiff was terminated by the Agency as a result of the false information provided to the PEB.

87.    Plaintiff intended to continue working for Agency/Defendant until eligible for retirement.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Discrimination based on Sex and Disability in Violation of Title VII of the Civil Rights Act of 1964**

88.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 87 above.

89.    42 U.S. Code § 2000e-2 of Title VII prohibits discrimination against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's sex and disability status, and for having reported discrimination.

90.    Defendant's termination of Plaintiff from employment was discriminatory.

91.    As a result of Defendant's actions, Plaintiff has suffered economic damages based on lost pay and all benefits of employment and also suffered emotional distress, resulting in damages in an amount to be proven at trial.  Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

92.    Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiffs' right to be free from discrimination based on race.

93.    Plaintiff is entitled to her reasonable attorneys' fees and costs of suit.

### SECOND CLAIM FOR RELIEF

**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**

94.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 93 above.

95.    42 U.S. Code § 2000*e et seq.* of Title VII, prohibits employers from discriminating against an employee because she requested a reasonable accommodation.

96.    Plaintiff requested and was granted a reasonable accommodation for her medical condition.

97.    An employer is prohibited from discriminating against an employee because she is perceived to have a speech disability.

98.    Mary A perceived the Plaintiff to have a speech disability, correcting her speech on more than one occasion.

99.    As a result of Plaintiff's requests for a reasonable accommodation, her reporting discrimination and harassment to agency management officials and the Agency EEO Counselor, her opposition to sexual harassment, Defendant's employees took materially adverse actions against Plaintiff, including, but not limited to issuing a Letter of Warning, Letters of Reprimand, and initiating a PEB regarding complying with employer requirements and terminating her employment.

100.    Defendant's adverse actions, including her termination, constituted retaliation.

101.    As a direct, legal and proximate result of Defendant's retaliation, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an

amount to be proven at trial.  Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for retaliation at trial.

102.    Plaintiff is entitled to her reasonable attorneys' fees and costs of suit.

## THIRD CLAIM FOR RELIEF

**Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964**

103.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 102 above.

104.    The allegations set forth above altered the terms and conditions of Plaintiff's employment.

105.    Plaintiff was subjected to harassment by Defendant's agents and employees including that Plaintiff is a member in a protected class.

106.    Defendant's agents and employees' conduct was not welcomed by Plaintiff.

107.    Defendant's agents and employees' conduct was because of the fact that Plaintiff is a member in a protected class (sex, disability, opposition to sexual harassment, reporting discrimination to the Agency EEO Counselor).

108.    The conduct was so severe or pervasive that a reasonable person in Plaintiff's position would find Plaintiff's work environment to be hostile or abusive.

109.    Plaintiff found her work environment to be hostile or abusive as a result of the conduct of the agents and employees of Defendant.

110.    Management level employees knew, or should have known, of the abusive conduct. Plaintiff provided management level personnel with enough information to raise a probability of sex and/or disability discrimination and harassment in the mind of a reasonable employer, and/or the harassment was so pervasive and open that a reasonable employer would have had

to have been aware of it.  Indeed, management level employees were themselves complicit in the abusive conduct.

111.   Defendant did not exercise reasonable care to prevent harassment in the workplace on the basis of sex and disability, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.

112.   As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic damages to be proven at trial.

113.   As a result of Defendant's actions, Plaintiff has suffered emotional distress, resulting in damages in an amount to be proven at trial.  Plaintiff further seeks compensatory and punitive damages and all other injunctive, declaratory, and monetary relief available for discrimination at trial.

114.   Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard to Plaintiff's right to be free from discrimination based on race/color.

115.   Plaintiff is entitled to reasonable attorneys' fees and costs of suit.

## DECLARATORY RELIEF ALLEGATIONS

116.   A present and actual controversy exists between Plaintiff and Defendant.  Plaintiff contends that Defendant violated his rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000*e et seq.*

117.    Plaintiff is informed and believes and thereon alleges that the Defendant denies these allegations.  Declaratory relief is therefore necessary and appropriate.

118.   Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

119. For a declaration that Defendant's actions, policies, and practices as alleged herein are unlawful;

120. For all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions, in an amount to be proven at trial;

121. For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

122. For punitive damages in an amount to be determined at trial;

123. For interest on lost wages, compensation, and damages, including pre-and post-judgment interest and an upward adjustment for inflation;

124. For an order enjoining Defendant from engaging in the unlawful acts complained of herein;

125. For reasonable attorneys' fees and costs of suit; and

126. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

127. Plaintiff demands a jury trial on all causes of action and claims to which she has a right to a jury trial.

Dated: November 22, 2022

Respectfully submitted,
ELIZABETH STONE
By Counsel

/s/ Matthew E. Hughes
Matthew E. Hughes (VSB No. 95105)
Law Office of Matt Hughes, PLLC
3900 University Dr., Ste 200
Fairfax, Virginia 22030
Fax (703) 884-3385
Tel (703) 844-0140
Email: matt@matthugheslaw.com
*Counsel for Plaintiff Elizabeth Stone*