**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| ELIZABETH STONE, | |
| Plaintiff, | |
| v. | No. 1:22-cv-1335 (MSN/IDD) |
| CENTRAL INTELLIGENCE AGENCY, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Plaintiff Elizabeth Stone brings employment discrimination claims under Title VII after she was terminated from the Central Intelligence Agency ("CIA") due to an extensive history of misconduct, insubordination, and poor performance. As alleged, Plaintiff was subjected to progressive discipline beginning in November 2016 after she continued to apply internally to positions at the agency without authorization—despite multiple warnings to stop doing so. In April 2017, Plaintiff received a poor performance review from her supervisor. Four months later, the agency convened a Personnel Evaluation Board ("PEB") to review Plaintiff's suitability for continued employment at the CIA. Plaintiff was terminated in in October 2017.

Because of her termination, the many warnings Plaintiff received, and various supervisory interactions that occurred beforehand, Plaintiff claims she was subject to discrimination, retaliation, and a hostile work environment based on sex and disability. As discussed in depth below, Plaintiff fails to state any plausible claims for relief, and her Complaint should be dismissed in full.

## FACTUAL BACKGROUND

As alleged, Plaintiff began working for the CIA in February 2005. Compl. ¶ 5. From October 11, 2015 to January 4, 2016, Plaintiff was a GS-13 level Finance Resource Officer assigned to Finance Policy. *Id.* ¶ 19.

### A. Relationship with Joseph M.

During her employment with the CIA, Plaintiff became friends with Joseph M., who was Chief of an office within Talent Management. *Id.* ¶ 25. Beginning in 2012 or 2013, Plaintiff alleges that Joseph M.'s communications became "more personal and increasingly in appropriate [sic]." *Id.* ¶ 26. Allegedly this included Joseph M. "describing female coworkers by their attractiveness or their physical proportions, disclosing which coworker he thought had homosexual

children, and discussing which agency couples he believed had engaged in spouse-swapping." *Id.*
In August 2013, Joseph M. texted Plaintiff that he "may have to stalk" one of Plaintiff's married, female friends. *Id.* ¶ 27. In June 2015, Joseph M. messaged Plaintiff that he believed his wife was having an extra-marital affair. *Id.* ¶ 28. Joseph M. allegedly shared details of the affair with Plaintiff at an after-work social gathering. *Id.* At the same gathering, Joseph M. pointed out women to Plaintiff who were his "type" and attempted to hug Plaintiff, "who rebuffed him." *Id.* ¶¶ 28–29.

In October 2015, Joseph M. allegedly began making frequent visits to see Plaintiff at her desk at work. *Id.* ¶ 37. On one such visit, Joseph M. allegedly asked Plaintiff to accompany him on a trip to a disposal room; Plaintiff declined. *Id.* In November 2015, Joseph M. told Plaintiff during a meeting: "Just go! If you want to go, just go!" *Id.* ¶ 28. Afterwards, Plaintiff blocked Joseph M. across all her social media accounts. *Id.* Plaintiff alleges that, by December 2015, she was afraid of being alone with Joseph M. and requested that a third party be present for any meeting she had with him. *Id.* ¶ 39. Plaintiff does not specify to whom this request was made and does not allege that she raised Joseph M.'s behavior with anyone at the CIA.

**B. Reassignment in January 2016.**

As alleged by Plaintiff, within the CIA employees routinely applied and interviewed for positions outside of their Career Service without prior approval. *Id.* ¶ 35. Different positions within the CIA have different time or "tour" requirements. *Id.* ¶ 36. Typical GS-13 positions have tour lengths of a few years. *Id.* If an employee attempts to transfer to a new position before completing her required tour length, that is referred to as being "short of tour." *Id.*

In early December 2015—only a few months into her tour—Plaintiff applied for a new position outside of her Career Service. *Id.* ¶¶ 19, 40. Plaintiff selected an interview date at the

same time she requested approval from her Career Service, the Office of Global Financial Management ("OGFM"), to apply for the position. *Id.* ¶ 40. The Chief of OGFM at the time was Ricky J.,[1] who allegedly held on to Plaintiff's paperwork without acting on it.[2] *Id.* ¶¶ 22, 40.

On January 5, 2016, Plaintiff was assigned to a different office within the Office of Global Services as an accountant. *Id.* ¶ 20. While in this role, Plaintiff's first-line supervisor was Duane G., in the Directorate of Support/Office of Finance/Working Capital Fund/OL and Office of Enterprise Service. *Id.* ¶ 32. Plaintiff's second-line supervisor was Jason A., the Chief of an office within the Directorate of Support/Office of Logistics.[3] *Id.* ¶ 33.

### C. Plaintiff's Allergy Diagnosis and Reasonable Accommodation.

On December 7, 2015, Mary A., the Deputy Director (and later Acting Director) of OGFM, interrupted Plaintiff during a meeting and corrected her speech. *Id.* ¶ 42. Plaintiff alleges that, almost two years later, on May 18, 2017, Mary A. again interrupted Plaintiff in a meeting "to correct her speech." *Id.* ¶ 73. Plaintiff alleges that this meeting "was a mediation of a complaint of discrimination filed by the Plaintiff with the Agency EEO Counselor"—but does not explain what complaint or type of discrimination was at issue. *Id.* Plaintiff does not allege that she had any speech impediment or other disability. Other than these two instances, two years apart, Plaintiff does not allege any other incidents of being interrupted or having her speech corrected.

On March 22, 2016, Plaintiff was diagnosed with allergies. *Id.* ¶ 43. Shortly afterwards

---

[1] Plaintiff alternatively refers to Ricky J. as "Rickey J."—presumably this is the same individual. *See* Compl. ¶¶ 22, 34, 83, 85.

[2] Plaintiff alleges that sometime between September and November 2013, Ricky J. "looked down [Plaintiff's] shirt and stated, 'stick with me and I'll take care of you.'" *Id.* ¶ 34. Plaintiff does not allege that she mentioned Ricky J.'s behavior to anyone else at the CIA.

[3] Plaintiff alleges that her new unit was "run" by Joseph M.'s spouse (unnamed), who was "above" Jason A. at the CIA. *Id.* ¶ 41.

she applied for, and was granted, a reasonable accommodation that allowed her to work at a different location three days a week. *Id.* On November 17, 2016, Plaintiff alleges that she experienced an allergic reaction at her workstation—itchy eyes, a running nose, and repeated sneezing. *Id.* ¶ 63. At mid-day, Plaintiff went to a meeting with Jason A. and Duane G. *Id.* After the meeting, Plaintiff left her workstation and reported to a "flex space" to continue working. *Id.* Plaintiff called Jason A. to tell him about her allergic reaction, allegedly due to the dust and mold in her workspace, and informed him that she was working from a flex space. *Id.* Plaintiff did not notify Duane G. about her location change. *Id.* Duane G. later reprimanded Plaintiff for failing to do so. *Id.* ¶¶ 65–66.

In February 2017, Duane G. required Plaintiff to attend meetings at her original work location on one of the days she was authorized to work at an alternate location. *Id.* ¶ 69. Plaintiff told Jason A. that this created a "hostile work environment" for her. *Id.*

### D. Plaintiff Receives Progressive Discipline for Unauthorized Applications.

On March 31, 2016, Jason A. approved Plaintiff to apply for a short-of-term position, with Duane G.'s concurrence.[4] *Id.* ¶ 44. Plaintiff then applied for a new position that allowed short-of-tour applicants to apply with the approval of their supervisor. *Id.* ¶ 45. On April 5, 2016, Plaintiff had a telephone conversation with Ricky J. *Id.* ¶ 46. Plaintiff requested to leave her current position short-of-tour; Ricky J. allegedly responded, "you are not going anywhere, so stop trying." *Id.* Plaintiff asked for an email memorializing the conversation. *Id.* The next day, Ricky J. emailed Plaintiff and stated that she would only be approved for short-of-tour requests in certain circumstances and any others would be rotation requests not available to her until the end of her

---

[4] Plaintiff alleges she also received approval in April 2016 from Tony A. and Greg (no last name), who allegedly were her first- and second-line supervisors at one point in time. Compl. ¶ 45.

current assignment.  *Id.* ¶ 47.

In May 2016, Plaintiff alleges that she was eligible to apply for positions short-of-tour and temporary duty assignments ("TDY") with six months of documented successful performance.  *Id.* ¶ 49.  Tony A. told Plaintiff she would need to successfully complete her performance appraisal cycle to qualify to apply.  *Id.*  On July 31, 2016, Tony A. rated Plaintiff successful in her performance appraisal.[5]  *Id.*  Ricky J. told Plaintiff her eligibility to apply to TDYs could be addressed next year.  *Id.* ¶ 50.

On May 17, 2016, Plaintiff contacted an Equal Employment Opportunity ("EEO") counselor, complaining that Tony A. "was discriminating against her, harassing her, and not providing her with her mid-cycle feedback."  *Id.* ¶ 51.  After being contacted by the EEO counselor, Tony A. agreed to provide Plaintiff with mid-cycle feedback.  *Id.* ¶ 52.  Plaintiff thereafter declined to file a formal complaint.  *Id.*

In June 2016, Plaintiff applied for a short-of-tour assignment, allegedly with the support of her supervisors.  *Id.* ¶ 54.  In August and September 2016, Plaintiff applied for "several positions" that required a Career Service conversion, for which Plaintiff needed OGFM approval to apply.  *Id.* ¶¶ 55–56.  In September 2016, Plaintiff discussed a career service conversion with Joseph M., who allegedly now supported her request.  *Id.* ¶ 57.  Plaintiff also communicated with an unnamed Human Resources Officer in a different Directorate who allegedly told her that she would be considered for a career service conversion if she obtained a position in that Directorate.  *Id.*  Plaintiff does not allege that she ever sought or obtained OGFM approval for a career service conversion.

---

[5] Plaintiff was reviewed out of cycle because Tony A. left his first-line supervisory position in July 2016 and was required to review Plaintiff before he left.  *Id.* ¶ 49.

On October 12, 2016, Plaintiff alleges that she contacted an EEO counselor regarding unspecified discrimination and harassment. *Id.* ¶ 58.

On November 15, 2016, Greg D. issued Plaintiff a warning letter due to her improper applications over the past ten months without the required approval from OGFM. *Id.* ¶ 60. The warning letter informed Plaintiff that her job applications were considered acts of insubordination. *Id.* On March 13, 2017, the CIA issued Plaintiff a written reprimand for "unprofessional behavior and insubordination" due to her applications to positions outside of her career service without approval. *Id.* ¶ 70. The CIA issued Plaintiff a *second* written reprimand on April 25, 2017, once again charging Plaintiff with" unprofessional behavior and insubordination" for her unapproved applications. *Id.* ¶ 71.

### E. Plaintiff's 2017 Performance Review.

Plaintiff alleges that, on October 31, 2016, Duane G. began to document "every mistake and error" she made. *Id.* ¶ 59. Sometime in January 2017, Plaintiff notified Jason A. that Duane G. was "creating a hostile work environment" for her. *Id.* ¶ 67. On January 27, 2017, Duane G. established Key Job Expectations ("KJE") for Plaintiff's performance appraisal period that ran from October 31, 2016 to April 27, 2017. *Id.* ¶ 67. Plaintiff alleges that the KJEs "appeared to be written for a GS-14 or GS-15 position" and "negatively impacted her opportunity to succeed" as a GS-13. *Id.*

In her April 27, 2017 performance appraisal, Duane G. rated Plaintiff as "lacking the ability to analyze and interpret financial information,' and requiring daily, 'technical and/or financial guidance.'" *Id.* ¶ 72. On June 27, 2017, Plaintiff filed an EEO Complaint, alleging that Jason A. and Duane G. discriminated against her "based on disability, sex, requesting a reasonable accommodation, retaliation, and creating a hostile work environment." *Id.* ¶ 74.

### F. Plaintiff Is Reprimanded for Taking Excessive Leave.

On July 7, 2017, Jason A. and Duane G. asked Plaintiff about her leave usage and requested that she produce a doctor's note for her absences. *Id.* ¶ 75. That same day, the two supervisors changed Plaintiff's work location and schedule. *Id.* ¶ 77. Plaintiff was no longer allowed to work from an alternate location. *Id.* ¶ 76. Moreover, Jason A. and Duane G. issued Plaintiff a written reprimand for taking excessive leave. *Id.*

On July 19, 2017, Plaintiff's supervisors contacted the CIA's Office of Inspector General ("OIG") to inquire about Plaintiff's whereabouts. *Id.* ¶ 80. Jason A. and Duane G. informed Plaintiff's Career Service that she was not at the OIG. *Id.* In early to mid-July 2017, Plaintiff again contacted an EEO Counselor and complained of discrimination and harassment. *Id.* ¶ 79.

### G. Plaintiff's Termination.

On August 23, 2017, Mary A. issued a memorandum recommending that the agency convene a Personnel Evaluation Board ("PEB") to consider Plaintiff's suitability for continued employment. *Id.* ¶ 81. Plaintiff alleges that the individuals named in her Complaint (*i.e.*, Mary A., Greg D., Ricky J., Joseph M., Jason A., and Duane G.) all provided the PEB with false information regarding her job performance and personality. *Id.* ¶¶ 81, 83.

On August 30, 2017, Plaintiff was assigned internally to a different finance office as a Finance Officer. *Id.* ¶ 21. Plaintiff was terminated on October 26, 2017. *Id.* ¶ 5.

### H. Plaintiff's March 28, 2018 EEO Complaint.

On March 28, 2018, Plaintiff filed a formal complaint with the CIA's Office of Equal Employment Opportunity ("OEEO"). *Id.* ¶ 14. While Plaintiff's formal complaint alleged some 16 different bases for discrimination, the OEEO accepted only three bases for investigation: (1) hostile work environment based on sex, disability, and protected activity for events stemming from

April 5, 2016 to Plaintiff's termination on October 26, 2017; (2) retaliation based on allegedly false information being provided to the PEB; and (3) discrimination based on sex, disability, and protected activity for Plaintiff's October 26, 2017 termination. Ex. A at 1–2 (FAD).[6]

On August 24, 2022, the CIA issued a Final Agency Decision ("FAD") adopting an administrative judge's order denying all of plaintiff's claims. *Id.* at 1–3; Compl. ¶ 15. On November 22, 2022, Plaintiff filed the instant Complaint, bringing three claims for relief: (1) sex and disability discrimination under Title VII; (2) sex and disability retaliation under Title VII; and (3) hostile work environment based on protected activity, sex discrimination, and disability discrimination under Title VII. *See id.* ¶¶ 88–113. Plaintiff alleges that as a result, she is entitled to lost wages, compensatory damages, attorneys' fees, and declaratory relief. *Id.* ¶ 116–25.

## LEGAL STANDARDS

A motion pursuant to Rule 12(b)(6) serves to test the legal sufficiency of the plaintiff's complaint in relation to the factual averments she puts forward. Although a court must accept as true all well-pled allegations in adjudicating such a motion, it need not credit allegations that are merely conclusory. *See Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[6] The Court may here consider the FAD at the motion to dismiss stage because it is "integral to and explicitly relied on in the complaint." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004). Plaintiff alleges that the "Agency issued a Final Agency Decision ("FAD") on August 24, 2022" and alleges that this makes her current action "timely filed." Compl. ¶¶ 15–16; *see Mustafa v. Iancu*, 313 F. Supp. 3d 684, 687 (E.D. Va. 2018) (finding EEO documents attached as exhibits to Defendant's motion to dismiss eligible for consideration because Plaintiff alleged timely contact with an EEO counselor).

# ARGUMENT

**I.** **Plaintiff's Claims for Disability-Based Discrimination, Retaliation, and Hostile Work Environment Under Title VII Are Not Cognizable (Counts I–III).**

As a threshold matter, Plaintiff's claims for discrimination, retaliation, and hostile work environment under Title VII based on her alleged disability should be dismissed because disability is not a protected status under Title VII. *See* Compl. ¶ 88–115. Title VII prohibits "discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-16(a). But "Title VII does not apply to disability claims." *Gonzalez v. Perdue*, 2020 WL 1281237, at *10 (E.D. Va. Mar. 17, 2020); *see also Hockaday v. Brownlee*, 370 F. Supp. 2d 416, 421 (E.D. Va. 2004) ("Two federal statutes provide a cause of action for disability discrimination: the Americans with Disabilities Act of 1990 ("ADA") . . . and the Rehabilitation Act of 1973."), *aff'd*, 119 F. App'x 567 (4th Cir. 2005). As such, Plaintiff's disability discrimination, retaliation, and hostile work environment claims must be dismissed for failure to state a claim. *See Crow v. McElroy Coal Co.*, 290 F. Supp. 2d 693, 696 (N.D. W. Va. 2003) (affirming dismissal of disability discrimination claim raised under Title VII, "[s]ince disability is not a protected class under Title VII").

**II.** **Plaintiff's Discrimination Claims Should Be Dismissed (Count I).**

Plaintiff does not state in her Complaint which alleged events or acts she attributes to sex and/or disability discrimination. For purposes of this motion, Defendant addresses every alleged act as both type of discrimination, unless Plaintiff specifically attributes the alleged conduct to one in particular (*e.g.*, Plaintiff alleges that Mary A.'s interruption of her speech was disability discrimination). Regardless, Plaintiff's Complaint is so scarce of supporting facts, she fails to plausibly allege that either type of discrimination occurred.

### A. Plaintiff's Allegations Against Ricky J. and Joseph M. are Time Barred.

To bring a discrimination claim in federal court—whether under Title VII or the

Rehabilitation Act[7]—Plaintiff must have timely exhausted her administrative remedies "by initiating contact with an EEO counselor within forty-five days of the date of the matter alleged to be discriminatory." *Chattopadhyay v. Thompson*, 644 (4th Cir. 2003); *see* 29 C.F.R. § 1614.105(a)(1); *Wilkinson v. Rumsfeld*, 100 F. App'x 155, 157 (4th Cir. 2004) ("Rehabilitation Act claims against the federal government must comply with the same administrative procedures that govern federal employee Title VII claims."). Plaintiff must do more than simply contact an EEO counselor, however—she must also timely file a complaint "with the EEOC or the Agency's EEO office." *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). The Fourth Circuit has "generally dismissed any claims in which the plaintiff has not exhausted his administrative remedies before bringing suit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 513 (4th Cir. 2005).

In her Complaint, Plaintiff alleges that Joseph M. and Ricky J., two CIA managers, made sexually suggestive remarks and conduct towards Plaintiff between 2013 and 2015. *See* Compl. ¶¶ 26–29, 34, 37–39. Plaintiff does not allege that she ever reported this conduct to an EEO counselor at the CIA.[8] In fact, the first EEO contact Plaintiff alleges is in May 2016—*six months* after Plaintiff's last allegedly problematic interaction with Joseph M. (which occurred in December 2015) and *three years* after Plaintiff's last allegedly problematic interaction with Ricky J. (which occurred in November 2013). *See id.* ¶¶ 34, 39, 51. Moreover, Plaintiff alleges that her May 2016 complaint was specifically about her then-supervisor, Tony A., who had failed to give her mid-cycle performance feedback. *Id.* ¶ 51. Plaintiff does not allege that she ever filed an EEO

---

[7] For the remainder of this Motion, Defendant analyzes Plaintiff's disability claims as if they were brought under the correct statute, i.e., the Rehabilitation Act.

[8] Plaintiff alleges that "by December 2015, she was afraid of being alone with Joseph M. and requested that a third party be present for any meeting she had with him." Compl. ¶ 39. Plaintiff never specifies that she made this request to an EEO counselor.

complaint regarding the alleged behavior of Joseph M. *or* Ricky J.  Accordingly, Plaintiff is barred from now bringing discrimination claims based on this earlier conduct of Joseph M. and Ricky J., which are both untimely and unexhausted.  *See Webster v. Johnson*, 126 F. App'x 583, 587 (4th Cir. 2005) (per curiam) (dismissing complaint as untimely for failing to comply with Title VII's forty-five day deadline); *DiPaulo v. Potter*, 733 F. Supp. 2d 666, 672 (M.D.N.C. 2010) ("Failure to timely initiate contact with an EEO counselor is grounds for dismissal."  (citing *Zografov v. V.A. Med. Ctr.*, 779 F.2d 967, 969–70 (4th Cir. 1985))).

### B. Only Plaintiff's Termination is an Adverse Action.

Besides her termination, Plaintiff alleges a host of other acts as discriminatory.  Simply put, while allegations of other acts and conduct may be relevant to Plaintiff's termination (the ultimate adverse action at issue), they are not stand-alone claims.  As discussed below, Plaintiff does not allege that she suffered any adverse effect on the terms, conditions, or benefits of her employment because of any of these other events.  Accordingly, none of the actions Plaintiff takes issue with—other than her termination—qualify as adverse actions upon which Plaintiff can base a discrimination claim under Title VII or the Rehabilitation Act.

It is well established that "not everything that makes an employee unhappy" can be the basis of an employment discrimination claim.  *Settle v. Baltimore Cnty.*, 34 F. Supp. 2d 969, 989 (D. Md. 1999), *aff'd*, 203 F.3d 822 (4th Cir. 2000).  "An absolute precondition to [any discrimination] suit [is] that some adverse employment action [has] occurred."  *Edmonson v. Potter*, 118 F. App'x 726, 728 (4th Cir. 2004) (quotation omitted).  Under current Fourth Circuit authority, only "adverse employment actions" that cause "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or . . . a significant change in benefits" are actionable under Title VII or the

Rehabilitation Act. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011); *O'Meara v. Wormuth*, 2022 WL 67321, at *6 (E.D. Va. Jan. 6, 2022) (applying same standard to Rehabilitation Act claim); *see also James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 377–78 (4th Cir. 2004) ("An adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." (quotation omitted)).

*Documenting Plaintiff's Mistakes.* Plaintiff alleges that, "[s]tarting on or about October 31, 2016, Duane G. documented every mistake and error [Plaintiff] made, no matter how inconsequential or minor, and later noted it as evidence of failing to meet key job expectations ("KJE")." Compl. ¶ 59. But "Plaintiff's allegations of increased scrutiny by Defendant, without more, do not constitute adverse actions for purposes of Title VII." *Drake v. Sci. Applications Int'l Co.*, 2019 WL 1574264, at *7 (D.S.C. Mar. 4, 2019). Here, Plaintiff does not explain how having her mistakes documented changed the terms, conditions, or benefits of her employment.

*Plaintiff's Key Job Expectations.* Plaintiff alleges that her new KJEs, established in January 27, 2017, "negatively impacted her opportunity to succeed" and "appeared to be written for a GS-14 or GS-15 position, not the GS-13 position which Plaintiff was responsible for." Compl. ¶ 67. However, "[a] disfavored change in a performance standard is only actionable where the new performance standard detrimentally alters the terms or conditions of the recipient's employment status." *Green v. Harvey*, 2005 WL 1308537, at *5 (D. Md. May 31, 2005). Plaintiff does not allege that her employment status was altered in any way because of her new KJEs. Nor does she explain in any detail how her "opportunity to succeed" was impacted.

*Plaintiff's Warnings & Reprimands.* Plaintiff alleges receiving a series of written reprimands and warnings, including: (1) a November 15, 2016 warning letter from Greg D. for unauthorized job applications; (2) a November 17, 2016 reprimand from Duane G. for not

informing him that Plaintiff reported to a different work location; (3) a March 13, 2017 written reprimand from "the Agency" for "unprofessional behavior and insubordination" for continuing to apply to jobs without authorization; (4) a April 25, 2017 written reprimand from "the Agency," again for the same behavior; and (5) a July 7, 2017, written reprimand from Jason A. and Duane G. for taking "excessive leave." Compl. ¶¶ 60, 66, 70–71, 78.

"Reprimands, whether oral or written, do not *per se* significantly affect the terms or conditions of employment." *Lewis v. Forest Pharm., Inc.*, 217 F. Supp. 2d 638, 648 (D. Md. 2002). Rather, the plaintiff must show that the reprimand "not only bruise[d] an employee's ego or reputation, but also work[ed] a real, rather than speculative, employment injury." *Id.* Plaintiff does not allege any real employment injury from her various warnings and reprimands. Accordingly, she has not plausibly alleged that any were adverse employment actions.

***Plaintiff's 2017 Performance Appraisal.*** In April 2017, Duane G. rated Plaintiff "as lacking 'the ability to analyze and interpret financial information,' and requiring daily, 'technical and/or financial guidance'" on her performance appraisal. Compl. ¶ 72. Like her written reprimands and warnings, Plaintiff's poor performance rating "does not in itself constitute an adverse employment action." *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003). "Rather, it is a mediate step, which, if relied upon for a true adverse employment action *(e.g.*, discharge, demotion, etc.) becomes relevant evidence." *Id.* (quotation omitted); *see also James*, 368 F.3d at 377 ("[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment." (quotation omitted)). Here, Plaintiff does not allege that her performance evaluation served as the basis for termination, or any other alteration of the terms of her employment. Accordingly, she has not plausibly alleged that her performance appraisal

constitutes an adverse employment action.

*Changes to Plaintiff's Work Schedule and Location.* In February 2017, Plaintiff alleges that Duane G. required her to attend meetings at her original worksite location on one of three days a week she was authorized to work at an alternative location. Compl. ¶ 69. Several months later, in July 2017, Jason A. and Duane G. changed Plaintiff's work location and schedule—ending Plaintiff's ability to work at an alternative location. *Id.* ¶¶ 76–77. But "termination of telework or alternative work privileges does not, without more, constitute an adverse employment action." *Staggers v. Becerra*, 2021 WL 5989212, at \*17 (D. Md. Dec. 17, 2021); *Walker v. Md. Dep't of Info. & Tech.*, 2020 WL 6393435, at \*3 (D. Md. Nov. 2, 2020) (listing cases). And Plaintiff does not allege any negative effects as a result of her changed work schedule and location. Accordingly, this cannot stand as a discrete act claim.

*Requesting a Doctor's Note.* On July 7, 2017, Jason A. and Duane G. asked Plaintiff "about her use of leave and required her to produce a Doctor's note for her absence." Compl. ¶ 75. Essentially, Plaintiff alleges that she was asked by her supervisors to justify and explain her leave from work. However, "[m]onitoring an employee's work product and time and attendance is a basic employment practice." *Simms v. Navy Fed. Credit Union*, 2002 WL 32971969, at \*5 (E.D. Va. Aug. 27, 2002). It is "not an adverse employment action." *Benton v. Burnsi*, 2017 WL 491251, at \*7 (D. Md. Feb. 7, 2017); *see also Wilson v. Susquehanna Bancshares, Inc.*, 2014 WL 2094039, at \*4 (D. Md. May 19, 2014) (holding that "allegedly monitoring [Plaintiff's] arrival and departure times" was not an adverse employment action); *Dawson v. Rumsfeld*, 2006 WL 325867, at \*6 (E.D. Va. Feb. 8, 2007 ("Increased scrutiny of an employee under the general policies and disciplinary procedures governing her employment is . . . not an adverse employment action." ). In any event, Plaintiff does not allege any effect to the terms, conditions, or benefits of her

employment.

***Calling OIG to Inquire About Plaintiff's Whereabouts.*** Plaintiff alleges that, on July 19, 2017, her supervisors contacted OIG to ask about Plaintiff's whereabouts and informed her career service that she was not at the OIG. Compl. ¶ 80. Like being asked to produce a doctor's note for her absence, having supervisors verify Plaintiff's whereabouts—presumably during the workday—is nothing more than normal monitoring of employee attendance at work. Thus, it too is not an adverse employment action. *See Benton,* 2017 WL 491251, at *7; *Simms,* 2002 WL 32971969, at *5.

***The PEB Memorandum.*** Plaintiff alleges that Mary A. "issued a memorandum requesting a PEB be convened to consider the Plaintiff's suitability for continued employment with the agency" on August 23, 2017. Compl. ¶ 81. Plaintiff further alleges that this memo contained "false and contrived information and innuendo regarding the Plaintiff's job performance and personality designed to support Plaintiff's termination." *Id.* Plaintiff alleges that she was terminated a month later "as a result of the false information provided to the PEB." *Id.* ¶ 86. Like Plaintiff's warning letters and performance appraisal, while this may be evidence relating to the ultimate adverse action of termination, the PEB memorandum is not by itself actionable.

## C. Plaintiff Fails to Plausibly Allege Sex Discrimination.

Other than her untimely allegations against Joseph M. and Ricky J., Plaintiff's Complaint is bare of any facts that would allow a plausible inference that the CIA's actions against her were due to sex discrimination. Plaintiff may establish her case using either direct or circumstantial evidence. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). "Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision." *Laing v.*

*Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (internal quotation marks omitted). Here, Plaintiff does not allege that *anyone* at the CIA made sexually inappropriate discriminatory comments or behavior towards her from January 2016 through her October 2017 termination.

As Plaintiff does not allege direct evidence of sex discrimination, she "must rely on the burden-shifting scheme established in *McDonnell Douglas*, 411 U.S. 792 [(1973)]." *Motley v. Virginia*, 2017 WL 1135613, at *8 (E.D. Va. Mar. 24, 2017). Under that scheme, to ultimately prevail on her claim a plaintiff must establish a *prima facie* case, which requires: "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *DiQuollo v. Prosperity Mortg. Corp.*, 984 F. Supp. 2d 563, 568 (E.D. Va. 2013) (citation omitted).

While Plaintiff does not need to plead a *prima facie* case to overcome a motion to dismiss, her "'[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Twombly*, 550 U.S. at 544). As such, although courts cannot require perfect symmetry between Plaintiff's allegations and the elements of a *prima facie* case, they "may look to the requirements of a *prima facie* case as a guide in assessing the plausibility of Plaintiff's claim for relief." *Craft v. Fairfax Cnty.*, 2016 WL 1643433, at *4 (E.D. Va. Apr. 26, 2016). Here, Plaintiff fails to plausibly allege a right to relief.

While Plaintiff alleges that her termination "was discriminatory," she does not allege that she was terminated *because of her sex*. Compl. ¶ 90. Instead, Plaintiff alleges that she was terminated after management officials provided the PEB with false information because of her alleged disabilities, and because she "oppos[ed] discrimination, oppos[ed] sexual harassment, report[ed] harassment, request[ed] a reasonable accommodation." *Id.* ¶ 84. In short, Plaintiff

claims that she was fired because of disability discrimination and as *retaliation* for various types of protected activity. But Plaintiff does not claim that her protected class—sex—is the reason she was fired. Nor does Plaintiff allege *any facts* that indicate that her termination was due to sex discrimination. And "without some connective thread between the alleged mistreatment and the protected status, there is no actionable claim for discrimination." *Gough v. Rock Creek Sports Club*, 2021 WL 795447, at \*2 (D. Md. Mar. 2, 2021).[9]

Plaintiff does not even allege who was responsible for her termination—*i.e.*, who the relevant decision-maker was. While she alleges that certain management officials "provided false information" to the PEB convened to evaluate her suitability for employment, she does not identify who was on the PEB, or if the PEB was ultimately responsible for her termination. Compl. ¶ 84. It is the intent of the decision-maker—not these other management officials—that is critical for Plaintiff's claim. *See Hicks v. Powell Staffing Sols., Inc.*, 2012 WL 5040715, at \*4 (E.D. Va. Oct. 17, 2012) (finding that because plaintiff did not allege a decision-maker who was aware of the plaintiff's protected class, she had not alleged a Title VII violation).

Likewise, Plaintiff fails to allege sufficient factual information, taken as true, to lead to the reasonable inference that she was performing her job satisfactorily. To the contrary, Plaintiff alleges a series of facts that indicate that she was *not* performing well. *See* Compl. ¶¶ 60, 70–72, 78, 81. From the face of her Complaint, it is far more plausible that Plaintiff was terminated as a result of poor job performance, unexplained absences, and insubordination—*not* sex discrimination. *See McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d

---

[9] While Plaintiff alleges some troubling comments and behavior of a sexual nature from at least two different management officials, these incidents all occurred in the 2013 to 2015 timeframe—*years* before Plaintiff's termination—and neither was allegedly in Plaintiff's supervisory chain. And, as discussed above, *see* Part II.A, Plaintiff never alleges that she reported this conduct to anyone at CIA during her employment.

582, 588 (4th Cir. 2015) (finding plaintiff's allegation that she was not hired due to discrimination "not plausible in light of the 'obvious alternative explanation' that the decisionmakers simply judged those hired to be more qualified and better suited for the positions"); *see also Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020) (finding that, in absence of any non-conclusory allegations tying the termination to the plaintiff's protected status, plaintiff's claim of racial discrimination would require the court to "disregard the reason given" for the termination).

Without more, Plaintiff's sparse and conclusory allegations are insufficient to state a plausible sex discrimination claim as to her termination.[10]  *Bing*, 959 F.3d at 618 (dismissing complaint where "[r]ather than drawing a reasonable inference" of discrimination from allegations, the court "would have to speculate to fill in the gaps"); *McCleary-Evans*, 780 F.3d at 584 (dismissing Title VII discrimination claim where plaintiff "did not allege facts sufficient to claim that the reason [defendant] failed to hire her was because of her race or sex"); *Coleman*, 626 F.3d at 190–91 (dismissing Title VII discrimination claim where plaintiff's "complaint conclusorily allege[d] that [he] was terminated based on his race, [but] d[id] not assert facts establishing the

---

[10] To the extent that the other conduct Plaintiff identifies as discriminatory, *see supra* Part II.B., qualifies as adverse employment actions—which it does not—Plaintiff fails to plausibly allege those actions were the result of her sex.  Critically, Plaintiff does not allege *any* facts regarding the decision-makers—Greg D., Jason A., Duane G., and Mary A.—to suggest that their actions were animated by sex discrimination.  For example, most of the actions that Plaintiff complains of were those taken by her first- and second-line supervisors, Duane G. and Jason A., all of which appear to be normal, supervisory actions such as monitoring Plaintiff's performance and attendance at work, regulating her office hours, giving feedback, and enforcing office policies regarding leave and attendance.  Because Plaintiff alleges no additional details, other than that these events occurred, there are no facts from which this Court can infer that Duane G. or Jason A. acted against Plaintiff because she is a woman, as opposed to simply because she was their employee.  The same goes for Mary A. and Greg D., who were also in management positions over Plaintiff and took normal supervisory actions against her.  The Court would therefore be forced to speculate to fill in the many gaps as to these actors' motivations.  *See Bing*, 959 F.3d at 618.  As such, Plaintiff's "assertions do not contain 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *McCleary-Evans*, 780 F.3d at 585).

plausibility of that allegation").

**D. Even if this Court Considered the Merits of Plaintiff's Disability Discrimination Claims, They Should Still Be Dismissed.**

Out of an abundance of caution, Defendant here addresses Plaintiff's disability discrimination claims as if she had properly brought them under the Rehabilitation Act. But Plaintiff's claims still merit dismissal even if they were correctly before this Court. Like her sex discrimination claims, Plaintiff bases her disability discrimination claims on a host of conduct from 2016 to October 2017, including her termination. *See* Compl. ¶¶ 88–93. However, as discussed above, *see supra* Part II.B, only Plaintiff's termination qualifies as an adverse action under either Title VII or the Rehabilitation Act.

The Rehabilitation Act "prohibits discrimination on the basis of disability in employment decisions by the Federal Government." *Lane v. Pena*, 518 U.S. 187, 193 (1996) (citing 29 U.S.C. § 791). Disability discrimination claims under the Rehabilitation Act are also subject to the *McDonnell Douglas* burden-shifting framework. *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006). The *prima facie* case requires showing that Plaintiff: (1) was disabled, (2) was otherwise qualified for the position, and (3) suffered "an adverse employment action solely on the basis of her disability." *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019) (citation omitted).

Plaintiff's disability discrimination claim lacks plausibility for two fundamental reasons. First, Plaintiff does not plausibly allege that she is either disabled—or perceived as disabled— under the Rehabilitation Act. Second, Plaintiff does not plausibly allege that her termination was due to any of her disabilities, perceived or otherwise.

### 1. Plaintiff Does Not Plausibly Allege that She is Disabled or Perceived as Disabled.

In her Complaint, Plaintiff alleges two separate disabilities—one actual, one perceived. However, as alleged, neither qualifies as a disability under the Rehabilitation Act. For purposes of the Rehabilitation Act, a disability is "a physical or mental impairment that substantially limits one or more major life activities of such individual" or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)–(C). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" or "the operation of a major bodily function." *Id.* § 12102(2)(A)—(B). Moreover, "only permanent conditions constitute a 'disability' for the purposes of the [Rehabilitation] Act." *Biniaris v. Hansel Union Consulting, PLLC*, 382 F. Supp. 3D 467, 473 (E.D. Va. 2019).

First, Plaintiff alleges that she was diagnosed with allergies in March 2016 and then obtained a reasonable accommodation for this condition for "which she was assigned to work at a different work location for three (3) days per week." Compl. ¶ 43. Plaintiff does not explain how her allergies limit any of her major life activities, whether it is a permanent condition, or indeed provide any other facts other than her diagnosis date. This is insufficient to allege that her allergies qualify as a disability under the Rehabilitation Act. *See Fedynich v. Lozano*, 2021 WL 710368, at *8–9 (E.D. Va. Feb. 23, 2021) (dismissing plaintiffs' Rehabilitation Act claims based on asthma where plaintiffs failed to allege sufficient plausible facts regarding the condition).

Second, Plaintiff alleges that Mary A. perceived her to have a speech disability. Plaintiff bases this perceived disability solely on two instances—one in December 2015, one two years later in May 2017—where Mary A. allegedly interrupted Plaintiff's speech during meetings. Compl. ¶¶ 42, 73, 98. Plaintiff offers no other facts to support her perceived disability. Plaintiff does not

explain how Mary A.'s interruption means that she believed Plaintiff had a speech disability. Interrupting another person while they are talking is open to many interpretations or explanations. For example, it is common (albeit potentially rude) to interrupt someone to correct their pronunciation of a word, supply a word the speaker has forgotten, correct a fact, or provide additional facts to someone's speech. Plaintiff provides no additional facts to suggest that Mary A.'s interruption equates to her belief that Plaintiff had a speech disability. Accordingly, Plaintiff has not plausibly alleged that she was perceived as disabled under the Rehabilitation Act. *See Shively v. City of Martinsville, Va.*, 2009 WL 3615014, at *4–5 (W.D. Va. Oct. 29, 2009) (dismissing plaintiff's Rehabilitation Act claim because she failed to allege "that Defendants perceived her as suffering from an impairment that substantially limited one or more major life activities").

### 2. Plaintiff Does Not Plausibly Allege Causation.

Simply put, Plaintiff does not allege any facts that make it plausible that she was fired because of discriminatory animus. First, Plaintiff's Complaint is bare of any indications that the relevant decision-makers were aware of her alleged disabilities or perceived her to be disabled. Plaintiff does not specifically allege that Mary A., Jason A., Duane G., or Greg D. knew that she had allergies. And while Plaintiff concludes that Mary A. "perceived" her to have a speech disability, she supports this only with her allegations that Mary A. interrupted her speech twice— conduct that is widely open to interpretation. Plaintiff does not allege that any other decision-makers, including Jason A., Duane G., or Greg D., perceived Plaintiff to have a speech disability.

On top of failing to plead knowledge of her disability, Plaintiff does not plead any discriminatory animus. Plaintiff's Complaint is bare of any conduct or statements that indicates that the relevant decision-makers acted against Plaintiff because of her disabilities—let alone

*solely* because of her disabilities as required by the Rehabilitation Act. *See Hannah P.*, 916 F.3d at 337 (4th Cir. 2019). Instead, Plaintiff's own allegations make it far more plausible that Plaintiff was terminated because of her poor performance and repeated violations of agency policy rather than as result of any disability discrimination. *See supra* Part II.C. Accordingly, there are far too many gaps in Plaintiff's narrative to allow the Court to infer that *any* of the actions taken against Plaintiff were taken "solely on the basis of her disability." *Hannah P.*, 916 F.3d at 337.

As a result, even if Plaintiff had properly brought her disability discrimination claims under the Rehabilitation Act, they would still merit dismissal. *See Kelly v. Town of Abingdon*, 437 F. Supp. 3d 517, 516–27 (W.D. Va. 2020) (dismissing plaintiff's disability discrimination claims where plaintiff failed to "allege some facts tending to show that the mistreatment he claims to have suffered was causally related to his disabilities"); *Manickavasagar v. Va. Comm. Univ. Sch. Of Med.*, 667 F. Supp. 2d 635, 645–46 (E.D. Va. 2009) (dismissing plaintiff's disability discrimination claims where he failed to allege that he was "otherwise qualified" and did not "plausibly allege facts that [his] disability formed the basis for his rejection").

III.     **Plaintiff Has Not Stated a Plausible Retaliation Claim (Count II).**

Whether under Title VII or the Rehabilitation Act, Plaintiff's retaliation claims are subject to the *McDonnell Douglas* burden-shifting framework. *See Walton v. Harker*, 33 F.4th 165, 177 (4th Cir. 2022) (discussing Title VII retaliation); *Smith v. CSRA*, 12 F. 4th 396, 416 (4th Cir. 2021) (discussing Rehabilitation Act retaliation). To survive a motion to dismiss, Plaintiff must allege beyond the speculative level that: "(1) she engaged in a protected activity; (2) the employer acted adversely against her; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008). Plaintiff alleges that due to her protected activity, "Defendant's employees took materially adverse actions against

Plaintiff, including, but not limited to, issuing a letter of warning and multiple reprimand letters, and initiating a PEB regarding complying with employer requirements and terminating her employment." Compl. ¶ 99.

Plaintiff's Complaint lacks any factual allegations that could lead this Court to "reasonably infer" that the decisionmakers for any of the alleged retaliatory acts had "awareness" of her protected activity. *Guillen v. Esper*, 2020 WL 3965007, at *13 (E.D. Va. July 13, 2020). It is axiomatic in the Fourth Circuit that "no causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity." *Strothers v. City of Laurel*, 895 F.3d 317, 336 (4th Cir. 2018).

Here, Plaintiff names Mary A., Greg D., Jason A., and Duane G. as the respective decision-makers behind convening the PEB (Mary A.), her November 2016 warning letter (Duane G.), and her July 2017 reprimand (Greg D. and Jason A.). *See* Compl. ¶¶ 60, 70–71, 78. Plaintiff's Complaint "contains no allegations explicitly stating, or even implying, . . . the ultimate decisionmaker was aware of any of plaintiff's protected activity." *Guillen*, 2020 WL 3965007, at *13. At most, Plaintiff alleges that Mary A. was at a May 18, 2017 mediation that Plaintiff had with an EEO counselor to discuss an unspecified complaint of discrimination. *See* Compl. ¶ 73.[11] However, Mary A. is not alleged to have been involved with any of Plaintiff's warning letters— and the next event Plaintiff alleges Mary A. was involved in is the August 23, 2017 PEB memorandum, over three months later. This is too large a temporal gap to create an inference of causation. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 127 (4th Cir. 2021).

---

[11] Plaintiff also alleges that an EEO counselor contacted Tony A. in May 2016 about Plaintiff's desire for mid-cycle feedback, *see* Compl. ¶¶ 51–53, so presumably Tony A. was aware that Plaintiff had contacted the EEO at that time. However, Plaintiff does not identify Tony A. as a decision-maker in any of the subsequent events she alleges were retaliatory.

Plaintiff fails to allege *any* decisionmaker with respect to her March and April 2017 reprimands, stating instead that "the Agency" issued the letters. Compl. ¶¶ 70, 81. Similarly, Plaintiff does not allege who was responsible for her termination. "Such factual allegations are absolutely necessary to a retaliation claim, and in their absence, Plaintiff's claim cannot raise a right to relief above a speculative level." *Carter v. Global Compliance Servs.*, 2013 WL 3043646, at *3 (W.D.N.C. June 17, 2013) (dismissing retaliation claim); *see also Phillips v. Loudoun Cnty. Pub. Sch.*, 2020 WL 2205065, at *9 (E.D. Va. May 6, 2020) (dismissing retaliation claim because "plaintiff must allege that the persons who are alleged to have retaliated against him *knew* of his protected activities" and he did not do so (emphasis in original)); *Guillen*, 2020 WL 3965007, at *13.

## IV.      Plaintiff's Hostile Work Environment Claims Merit Dismissal (Count III).

Lastly, Plaintiff brings discriminatory and retaliatory hostile work environment claims based on an amalgamation of allegations from her Complaint. Plaintiff's cobbled-together hostile work environment claims fail for three reasons. First, Plaintiff's allegations regarding Joseph M. and Ricky J. are time-barred and cannot be included in her present claim. Second, Plaintiff alleges no comments or behavior beyond those of Joseph M. and Ricky J. that evince discriminatory or retaliatory animus. Third, Plaintiff does not allege the type of severe or pervasive conduct required to sustain a hostile work environment claim. Instead, Plaintiff alleges a series of standard acts a supervisor may take towards an employee, which she evidently believes were unfair or unwarranted. Thus, Plaintiff's hostile work environment claim merits dismissal.

To state a claim for a hostile work environment based on sex or disability, Plaintiff must allege facts tending to show: "that the offending conduct (1) was unwelcome, (2) was because of her [sex or disability], (3) was sufficiently severe or pervasive to alter the conditions of her

employment and create an abusive work environment, and (4) was imputable to her employer." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011) (applying standard to Title VII claims); *see also Pueschel v. Peters*, 577 F.3d 558, 564–65 (4th Cir. 2009) (applying same under the Rehabilitation Act). A hostile work environment claim based on retaliation must allege "retaliatory conduct" that "(1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker from making or supporting a charge of discrimination, and (3) can be attributed to the employer." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 218 (4th Cir. 2022).

### A. Plaintiff's Allegations Regarding Joseph M. and Ricky J. Cannot Be Imputed to the CIA and Are Time-Barred.

Plaintiff alleges that Joseph M. and Ricky J.—two men in supervisory positions albeit not directly over Plaintiff—made sexually explicit comments (and at least one instance of unwanted behavior) towards her on several occasions ranging from approximately August 2013 through December 2015. *See* Compl. ¶¶ 26–29, 34, 38–39. Plaintiff does not allege that any inappropriate behavior or comments based on her sex continued after December 2015.

As an initial matter, liability can only be imputed to employees not in the plaintiff's supervisory chain if the employer "knew or should have known about the harassment and failed to take effective action to stop it by responding with remedial action reasonably calculated to end the harassment." *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 498 (4th Cir. 2015). Nowhere in her Complaint does Plaintiff allege that she reported this purported sexual harassment to anyone at the CIA. On that basis alone, the Court may dismiss this portion of Plaintiff's hostile work environment claim.

The lack of any allegation of reporting this alleged behavior gives the Court a second basis to dismiss Plaintiff's hostile work environment as to the purported sexual harassment between

2009 and 2015—as with any discrete act claim relating to these alleged events, these allegations are untimely because she did not exhibit an intent to begin the EEO process within 45 days of any of the alleged harassing acts.[12] And she cannot bootstrap these allegations to her timely allegations of hostile work environment related to Jason A. and Duane G. in 2017 because "[a]n incident that 'ha[s] no relation to the [other] acts' cannot be considered as part of the hostile work environment claim." *Mustafa*, 313 F. Supp. 3d at 696 (quoting *Nat'l R&R Passenger Corp.*, 536 U.S. at 118)). Accordingly, "incidents can only qualify as a part of the same hostile work environment claim if they are adequately linked—that is, if the incidents "involve[] the same type of employment actions, occur[] relatively frequently, and [are] perpetrated by the same managers." *Id.* (alterations in original) (quoting *Nat'l R&R Passenger Corp.*, 536 U.S. at 120–21)).

Here, there is no link between the conduct Plaintiff alleges from Joseph M. and Ricky J. and the remainder of her hostile work environment claims. Plaintiff alleges a pattern of sexual harassment from Joseph M. and Ricky J. between 2013 and December 2015. Compl. ¶¶ 26–29, 34, 37–39. The remainder of her alleged acts involve different managers—Jason A., Duane G., Mary A., Tony A. and Greg. Indeed, her allegations largely center around the managerial actions of her first- and second-line supervisors (Duane G. and Jason A.) from October 2016 until her termination. Accordingly, her allegations against Joseph M. and Ricky J. cannot be considered part of the same pattern of continuing violations in order to render them timely for purposes of her hostile work environment claim.

### B. Plaintiff Does Not Allege Any Remarks or Behavior Tied to Her Protected Characteristics.

After December 2015, Plaintiff does not allege that anyone directed any offensive remarks

---

[12] Plaintiff alleges her first contact with the EEO was in May 2016, at least five months after any allegations regarding Joseph M. or Ricky J.

or behavior at her regarding her sex, disability, or prior protected activity. To plead a plausible hostile work environment claim, a plaintiff must allege putative harassment "on account of" the employee's protected class. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 191 (4th Cir. 2019); *see also Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 162 (4th Cir. 2018); *Dawson v. Rumsfeld*, 2006 WL 325867, at *3 (E.D. Va. Feb. 8, 2006). As the Fourth Circuit has explained: "several of the allegedly offensive comments cataloged by [the plaintiff] are not even related to her gender . . . We have made clear that only harassment that occurs because of the victim's gender [or other protected class] is actionable." *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997).

Plaintiff's allegations that the letters of reprimand and warning, the convening of the PEB, and her termination are devoid of any inference of animus based on a protected classification. The Court "cannot jump from the mere existence of criticism to the conclusion that the criticism was . . . motivated [by membership in a protected class]." *Webster*, 126 F. App'x at 587-88; *see also Sammarco v. Bd. of Educ. of Prince George's Cnty.*, 2013 WL 5274277, at *4 (D. Md. Sept. 16, 2013) (dismissing hostile work environment claim because it was "almost entirely related to the formal and informal feedback she received about her performance" and her claims of disparate treatment were "supported by no factual allegations such that the court can infer her treatment was based on race or age"), *aff'd*, 556 F. App'x 200 (4th Cir. 2014). Plaintiff may believe she was treated unfairly, but nothing in her allegations suggest that Defendant's alleged actions were accompanied by offensive or derogatory statements connected with a protected characteristic or activity.

The only two instances Plaintiff alleges that could, at a stretch, be construed as derogatory or demeaning conduct were the two times that Mary A. "interrupted Plaintiff in a meeting to correct

her speech." Compl. ¶¶ 42, 73. Plaintiff alleges that these two statements, which occurred a year and a half apart—show that Mary A. "perceived Plaintiff to have a speech disability." *Id.* But as discussed above, the simple act of correcting someone's speech is open to numerous, plausible explanations—most of which are *not* discriminatory. *See, e.g.*, *Zayas-Ortiz v. Becton Dickinson Caribe, Ltd.*, 968 F. Supp. 2d 463, 474 (D.P.R. 2013) (finding correcting English pronunciation not sufficiently severe or pervasive).

In any event, two instances of neutral conduct over a two-year time period is neither "severe" nor "pervasive." *Cf. Colon Anabitarte v. Frito Lay Quaker Puerto Rico*, 2009 WL 5892997, at *17 (D.P.R. Oct. 13, 2009) (finding that plaintiff's claims "he was subject to continued harassment, jokes, and mockery at Frito Lay due to his age, speech, and diabetes related visual impairments" was insufficient to alter the terms of his employment). Rather it falls under the category of "offhand comments" and "isolated incidents" that courts routinely find insufficient to sustain a hostile work environment claim. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." (quotation omitted)), *abrogated on other grounds by Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020).

**C. Plaintiff Does Not Allege Severe or Pervasive Misconduct Under Either Standard.**

Finally—outside of the two instances of speech correction—the conduct Plaintiff alleges as contributing to a hostile work environment is nothing more than her objection to typical supervisory and managerial actions, such as enforcing agency policies regarding attendance and inter-agency applications, requesting notes of absence, documenting employee performance,

establishing job expectations, and giving year-end performance reviews.[13]  *See* Compl. ¶¶ 60, 65–67, 70–72, 75–78, 80.

For purposes of her sex and disability hostile work environment claims, severe or pervasive means that "the Plaintiff's workplace must be 'permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Roberts v. Fairfax Cnty. Pub. Sch.*, 858 F. Supp. 2d 605, 609 (E.D. Va. 2012) (quotation omitted).  "Conduct must be extreme to amount to a change in the terms and conditions of employment, and courts have made it clear that Title VII does not mandate a general code of civility."  *Rizkalla v. Eng'g, Mgmt. & Integration, Inc.*, 2006 WL 4459434, at *13 (E.D. Va. Aug. 29, 2006), *aff'd*, 222 F. App'x 262 (4th Cir. 2007).  Moreover, the severe and pervasive element requires that the plaintiff allege "that the work environment was not only subjectively hostile, but also objectively so."  *Bonds*, 629 F.3d at 384.  To determine whether the work environment was objectively severe or pervasive, courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employees work performance."  *EEOC v. Central Wholesalers, Inc.*, 573 F.3d 167,176 (4th Cir. 2009).  "Activities like simple teasing, offhand comments, and off-color jokes, while often regrettable, do not cross the line into actionable misconduct."  *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010).

The standard is somewhat lower for a hostile work environment claim based on retaliation. In the retaliation context, severe or pervasive means conduct that "would dissuade a reasonable

---

[13] To the extent Plaintiff seeks to make Jason A. and Duane G.'s alleged failure to accommodate her disabilities a part of a hostile work environment claim, she cannot do so.  *Katz v. Barr*, 2021 WL 3809034, at *10 (E.D. Va. Aug. 26, 2021) (citing cases).

worker from making or supporting a charge of discrimination." *Laurent-Workman*, 54 F.4th at 217. However, "[t]he severity and frequency of hostility are important factors to consider when determining whether the circumstances would dissuade a reasonable employee from opposing discrimination, just as they are for assessing substantive hostile work environments." *Id.*

Here, Plaintiff has not alleged severe or pervasive conduct under either standard. Instead, her allegations consist of nothing more than typical supervisory actions to notify an employee that she is underperforming and/or not following agency policy by issuing progressively increasing discipline. *See Combs-Burge v. Rumsfeld*, 170 F. App'x 856, 862 (4th Cir. 2006) (concluding that supervisor's criticism, micromanaging, and nitpicking of plaintiff were not sufficient to sustain hostile work environment claim, even where supervisor was more friendly to white employees); *Hinton v. Va. Union Univ.*, 185 F. Supp. 3d 807, 840 (E.D. Va. 2016) (finding that plaintiff's allegations that he received two verbal reprimands, one written reprimand, and was denied class-taking privileges was insufficient to state a claim for a retaliatory hostile work environment); *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (affirming dismissal of claim based on allegations that plaintiff's supervisor criticized her work performance, changed her work duties, and terminated her when she failed to perform the new work duties); *Short v. Berryhill*, 2019 WL 4643806, at *17 (D. Md. Sept. 24, 2019) (finding placement on a performance plan, repeated criticism of plaintiff's performance, her supervisor's refusal to answer her questions verbally, and a "series of aggressive emails" did not amount to hostile work environment).

Accordingly, Plaintiff has failed to state a hostile work environment claim.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests this Court dismiss Plaintiff's Complaint in its entirety.

Dated: June 22, 2023

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____

MEGHAN LOFTUS
CAROLYN M. WESNOUSKY
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3757/3996
Email: Meghan.loftus@usdoj.gov
Carolyn.Wesnousky@usdoj.gov

*Counsel for Defendant*